Date signed April 20, 2015



ROBERT A. GORDON
U. S. BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
at Baltimore

In re:                                          *

Julie Lee Kestner and                           *       Case No. 12-32831-RAG
Melvin Dean Kestner                                             12-32832-NVA
                                                *               (jointly administered)
        Debtors                                         Chapter 11
                                                *

*       *       *       *       *       *       *       *       *       *       *       *       *

MEMORANDUM OPINION IN SUPPORT OF ORDER DENYING
MOTION FOR RECONSIDERATION AND GRANTING IN PART DEBTORS'
COUNSEL'S INTERIM APPLICATION FOR COMPENSATION

I.      **Preliminary Statement**

        Before the Court is the Corrected First Amended Interim Application for Compensation

for Counsel for the Debtor and Debtor in Possession and for Reimbursement of Expenses

(12/27/12-08/31/13) (Fee Application) (Dkt. No. 169) and the Debtors' Motion for Revisory

Relief Pursuant to Fed. R. Civ. P. 59(e) and Fed. R. Bankr. P. 9023 (Motion for Reconsideration)

(Dkt. No. 128), both related to the compensation of Debtors' Counsel, John Burns, Esquire and

The Burns Law Firm, LLC (Counsel).  These papers are naturally intertwined with disputes that

stretch back to the early days of these consolidated cases.  Counsel's reconsideration arguments

challenge the authority of the bankruptcy court to regulate and review the award of attorneys'

fees in addition to the process employed. While, in the end, Counsel's entirely warranted decision to dramatically slash his requested fee largely addresses concerns regarding the value and appropriateness of his services, the questions raised by Counsel necessitate the issuance of something beyond a simple order of approval.

## II.    **Procedural and Factual Background**

In order to accurately determine the value of an attorney's services, it is essential to look at the history of the case. The case of Julie Kestner (Lead Case) (Case No. 12-32831) and the separate case of her husband Melvin Kestner (Case No. 12-32832) were filed simultaneously on December 27, 2012 under Chapter 13 of the Bankruptcy Code. When the cases were converted to Chapter 11 less than five months later on May 9, 2013, there were already over 100 docket entries in the Lead Case. That reflects an extraordinary amount of activity for a Chapter 13 and most of it was borne of the, at best, misguided, and, at worst, frivolous strategy of Counsel.

### A.    *Pre-Petition State Court Litigation*

The filing of these cases was precipitated by a tort suit brought by Ms. Kestner's ex-husband, James Nicholson, against the Kestners and Rebecca Forbes in the Circuit Court for Anne Arundel County (State Court Case). At the conclusion of the jury trial, two (apparently separate) $350,000 judgments were entered against Mr. and Ms. Kestner on October 17, 2012 (Judgment).[1] The Kestners and their co-defendant filed a motion for a new trial and motion for remittitur on October 26, 2012 (Dkt. No. 45-2).[2] When Mr. Nicholson moved to enforce the

---

[1] The question as to whether the judgment was a joint judgment of $700,000 or two judgments of $350,000 against each of the Kestners was debated. The entry of a new judgment and the parties' settled resolution of its payment, in addition to the agreed dismissal of these cases, has rendered that question moot.

[2] Docket numbers will correspond to the docket numbers in the Lead Case unless otherwise noted.

Judgment, and before the state court ruled on the Kestners' post-judgment motions, these bankruptcy cases were filed.

### B.   Motions to Dismiss

The verve of the state court dispute quickly tumbled into this forum.  On February 15, 2013, Mr. Nicholson filed a Motion to Dismiss Chapter 13 Case (Nicholson MTD) (Dkt. No. 24).  The Nicholson MTD requested dismissal on two grounds: (1) that Ms. Kestner did not qualify as a Chapter 13 debtor under Section 109(e) and (2) bad faith.  The Chapter 13 Trustee (Trustee) also filed a Motion to Dismiss Case Because of Failure to Qualify for Relief Under Chapter 13 (Trustee MTD) (Dkt. No. 42) on March 7, 2013.  While the Trustee and Mr. Nicholson's arguments differed regarding the treatment of certain claims, the underlying basis of both was that Ms. Kestner's noncontingent, liquidated, unsecured debts exceeded the then applicable Chapter 13 debtor cap of $360,475 set by 11 U.S.C. § 109(e).[3]  Similar motions to dismiss were filed in Mr. Kestner's case (Case No. 12-32832, Dkt. Nos. 27 & 47).

At the time the motions to dismiss were filed, Ms. Kestner's schedules and filed claims reflected the following relevant debts:

- $204,216.15 owed to Bank of America, secured by real property known as 350 Earls Road in Baltimore County (BoA Claim);

- $350,000 owed to Mr. Nicholson as a result of the Judgment;

- $194,328.79 in "secured" claims held by BB&T which Ms. Kestner had guaranteed on behalf of her business (BB&T Claims);

- $69,797.59 in "secured" claims held by M&T which Ms. Kestner had guaranteed on behalf of her business (M&T Claims); and

- $19,191.17 in general unsecured claims.

---

[3] Unless otherwise noted, all statutory citations are to the Bankruptcy Code (Code) found at Title 11 of the United States Code and rule citations are to the Federal Rules of Bankruptcy Procedure (Rules).

Both of the Motions to Dismiss pointed out that the Earls Road property, which secured the BoA Claim, had been transferred to J&M Property Company, LLC and was no longer owed by Ms. or Mr. Kestner individually.  Therefore, for the purposes of the Kestners' bankruptcies, the BoA Claim was unsecured.  Ms. Kestner conceded this point and amended her schedules appropriately (Dkt. No. 47).  As a result, it was undisputed that Ms. Kestner had at least $223,407.32 in liquidated, noncontingent unsecured debt at the time the case was filed.

Moreover, the Nicholson MTD argued that the M&T and BB&T Claims (Guarantee Claims) were also unsecured.  Ms. Kestner likewise conceded that the Guarantee Claims were unsecured and her schedules were also amended for that reason.  *Id.*  But the Nicholson MTD further argued that Middle River Sweeping, LLC and J&M Sweeping, LLC the primary obligors on the M&T and BB&T claims, were in default on their obligations and therefore he Guarantee Claims were no longer contingent (or unliquidated) and their $264,126.38 balance should be added to Ms. Kestner's other qualifying liquidated, noncontingent, unsecured debt to put her well over the Section 109(e) limit.  Finally, the Nicholson MTD alleged bad faith in the filing, relying upon the allegations that (a) the case was a "two-party dispute," filed mainly to protect the Kestners from enforcement of the Judgment without the necessity of a bond and (b) the Kestners had sold or transferred several automobiles to family members just prior to filing and had not disclosed those transfers.[4]

The Trustee MTD took another angle to attack the quality of Ms. Kestner's debt totals. The Trustee averred that it was Ms. Kestner's position that the Judgment was only against her personally and was not a joint judgment as to her and Mr. Kestner.  As such, the Judgment would

---

[4] Ms. Kestner filed an Amended Statement of Financial Affairs (Dkt. No. 35) on March 1, 2013 which disclosed five previously undisclosed transfers of automobiles within three months of filing.  Four of the five transfers were to family members and two of those were for no consideration.

not attach to property held as tenants by the entireties, such as the Kestners' primary residence. Because Ms. Kestner did not individually own any real property, the Judgment would therefore have to be unsecured.  The Trustee also asserted that because the claim was reduced to judgment, the debt was no longer contingent or unliquidated.  If the $350,000 judgment was included, Ms. Kestner would be well above the $360,475 limit.[5]

The hearing on the Nicholson MTD was scheduled for March 12, 2013, which was also the last day to file responses to the same.  As the Trustee's MTD had been filed only five days earlier, it had not been set for hearing that day.  On the morning of the hearing, Ms. Kestner timely filed her Memorandum in Response to Motion to Dismiss filed by James Nicholson and Motion to Dismiss filed by Chapter 13 Trustee, Ellen Cosby (MTD Response) (Dkt. No. 45). Because that left insufficient time to digest the MTD Response, or for the parties to respond to it, the hearing was continued to April 12, 2013.

The MTD Response argued that the Judgment was contingent and unliquidated as, under Maryland law, the post-trial motions in the state court undercut its finality. The Debtors further argued that the fact that the Kestners' principal residence was held as tenants by the entireties did not prevent a judgment lien from attaching in the first instance.  It merely meant that the Debtors might, at their option, exempt the property from execution.[6]  Debtors also argued that the Guarantee Claims remained contingent as the holders of the claims had made no demand upon Ms. Kestner for payment.  Unfortunately, the allegedly favorable letters submitted with the MTD Response did not support that notion.  The letter from BB&T was dated February 26, 2012 (and therefore practically irrelevant to the question) and the letter from M&T Bank seemed to indicate

---

[5] The motions to dismiss filed in Mr. Kestner's case were much the same although they were based solely on the BoA Claim and the Judgment.  Mr. Nicholson was apparently not a co-guarantor on the Guarantee Claims.

[6] Ms. Kestner had, in fact, already exempted her interest in the residence on the basis of her tenants by the entireties ownership (Dkt. No. 14).

an expectation that M&T would be repaid through Ms. Kestner's Chapter 13 Plan which of course is evidence that M&T considered the debt to be in default and fully due and payable. Finally the MTD Response stated that the failure to include the transfer of several vehicles in the Statement of Financial Affairs (SOFA) was merely an oversight and that Ms. Kestner had amended her SOFA after being instructed to do so.

The Trustee and Mr. Nicholson each filed a reply to the MTD Response (Dkt. Nos. 63 & 66, respectively).  The Trustee relied upon significant precedent in support of the proposition that judgment finality was not required in order for a court to find that a tort claim was liquidated and noncontingent.  The Trustee also averred that it was well-settled in Maryland that a judgment against only one spouse does not attach to property held as tenants by the entirety.  Mr. Nicholson's Reply to Memorandum in Response to Motion to Dismiss likewise argued that the Judgment was liquidated and noncontingent.

C.    *Motion for Relief from Stay and Motion to Stay*

While the motions to dismiss were pending, on February 28, 2013, the Debtors filed a Motion for Relief from the Automatic Stay to Permit Further Proceedings in Domestic Relations Matter Pursuant to 11 U.S.C. §§ 105 and 362(a), (d) (Motion for Relief) (Dkt. No. 32) in each case requesting that the Court lift the stay to allow the Debtors to prosecute their post-judgment motions in the State Court Case.  On March 18, 2013, Mr. Nicholson filed a response (Dkt. No. 59) contesting whether the stay needed to be lifted in light of the posture of the State Court Case. Although both parties appeared to agree that they wanted the State Court Case to go forward (and indeed as a practical matter, it had to go forward lest these bankruptcy cases remain in limbo forever), on March 20, 2013 Debtor filed a Reply (Dkt. No. 60) and argued that the stay

was in place.  On April 11, 2013, the Court entered an order modifying the automatic stay to allow the State Court Case to proceed to final resolution (Dkt. No. 88).

On March 14, 2013, Debtors filed motions to stay each bankruptcy case (Dkt. No. 55; Case No. 12-32832, Dkt. No. 50).  The motions requested that after a (hopefully favorable) determination was made on the Motions to Dismiss, all matters be brought to a halt pending the outcome of the State Court Case.[7]  Mr. Nicholson and the Trustee opposed the requested stay (Dkt. Nos. 69 & 74).  The question presented was scheduled for hearing on May 8, 2013.

D.    *Motion to Consolidate*

On March 25, 2013, the Chapter 13 Trustee filed Motions to Administratively Consolidate Chapter 13 Cases (Motion to Consolidate) (Dkt. No. 67) in each case.  The Trustee pointed out that the dockets in the Kestners' cases largely mirrored each other and administrative consolidation would be exceedingly more efficient than separate tracking.  The Debtors responded (Dkt. No. 82) with vehement opposition, relying upon the fear that administrative consolidation could lead to the aggregation of their unsecured debt and undercut their defense to the Motions to Dismiss.  The question presented was scheduled for hearing on April 12th. However, on April 11th Chief Judge Nancy Alquist (to whom Mr. Kestner's case had originally been assigned) signed an Order Granting Trustee's Motion to Administratively Consolidate Chapter 13 Cases (Case No. 12-32832, Dkt. No. 80).  As a result, both cases were assigned to the Oversigned and the Lead Case designated as such.  As the Oversigned needed time to review Mr. Kestner's case file, the hearing originally scheduled for April 12th in the Lead Case was moved to May 8, 2013 with all matters pending in Mr. Kestner's case scheduled for hearing on the same day.

---

[7] The Motion to Stay also characterized the State Court Case as "an out of control escalation from a domestic relations custody dispute," to which Mr. Nicholson strongly objected.

E.    *First Order to Justify Fee*

While preparing for the hearing originally scheduled for March 12th on the Nicholson MTD (the first scheduled hearing in the Lead Case) the Court reviewed, among other things, the disclosures of compensation (Case No. 12-32831, Dkt. Nos. 3, 9 & 23; Case No. 12-32832, Dkt. Nos. 3, 9 & 25).  The Corrected Disclosure of Compensation of Attorney for Debtor (Lead Case Disclosure) (Dkt. No. 9) in Ms. Kestner's case, filed on January 7, 2013, stated that Debtors' Counsel, John Burns, Esquire, had received $4,500 for representation in the Lead Case and that such representation would be in accordance with "Appendix F4B," one of this Court's three presumptively reasonable flat fee arrangements for Chapter 13 debtor representation.[8]  The referenced section includes the highest ($4,500) of the three.  Under this arrangement, the flat fee is intended to cover all work in the main bankruptcy case save for adversary proceedings, appeals, US Trustee audits and approved additional fees for work done upon matters that were not reasonably expected and that are extraordinary.  No adversary proceedings, appeals or audits were pending as of March 2013.

Therefore, the Court was surprised to see that the Lead Case Disclosure included a line stating "[a] litigation retainer of $10,000 was received from Barbara Kestner with $2,725.50 having been earned."  The Corrected Disclosure of Compensation of Attorney for Debtor in Mr. Kestner's case was identical, except that it stated that $1,935 of the $10,000 litigation retainer had been earned (Case No. 12-32832, Dkt. No. 9). Accordingly, Counsel for the Debtors had received $29,000 to represent spouses in two simultaneously pending Chapter 13 cases[9] and, as a result of some unspecified litigation had already "earned" $4,600 in addition to the $9,000

---

[8] Local Bankruptcy Rule 9010-6 and Appendix F.

[9] Where both spouses decide to file bankruptcy a joint case is almost always selected and their attorneys will generally charge joint filers the same "flat rate" as an individual debtor.

8

earned through the flat fee arrangement. While the Court was aware of the State Court Case (because of the furious activity swirling around the motions to dismiss), a third Disclosure of Compensation of Attorney for Debtor (Dkt. No. 23) indicated that the Debtors had retained Peter McDowell, Esquire, to represent them in that venue and had paid him $5,113.00. As a result of the Court's concern regarding the vague and confusing information included in the disclosures of compensation, the Court stated at the March 12th hearing that it would issue an order to justify fee.

An Order to Justify Fee (First Order to Justify Fee) (Dkt. No. 61) that specified the Court's concerns was entered on March 22, 2013. It also ordered Debtors' Counsel to provide (within ten days) a written response with memorandum (if desired) a statement of services rendered and copies of all documents related to the fee arrangement and payment of fees. On April 1, 2013, Mr. Burns filed his Response to Show Cause Order (Response) (Dkt. No. 72). Notwithstanding the directives included in the First Order to Justify Fee, the Response consisted of only a short memorandum stating that Mr. Burns has been involved in the representation of the Debtors in the State Court Case and anticipated that related adversary proceedings would arise in bankruptcy. It also promised that applications for employment would be filed by April 10th. None of the documentation required by the First Order to Justify Fee was filed. The First Order to Justify Fee was set in for hearing on April 12th along with the Motions to Dismiss, but like all other matters set for that day, the hearing was continued to May 8, 2013.

F.    *Motion to Convert and May 8th Hearing*

On April 13, 2013, the Debtors unexpectedly folded and filed a Motion to Convert Jointly Administered Cases to Chapter 11 (Motion to Convert) (Dkt. No. 92) which mooted all debate

regarding the Section 109(e) debt limits.[10]  At the May 8th hearing, Mr. Nicholson confirmed

that in light of the conversion he did not intend to continue prosecuting his contention that the

Debtors were proceeding in bad faith.  Hence, the Court granted the conversion of the two cases

and denied the Motions to Dismiss as moot (Dkt. Nos. 108, 110-11, respectively).  Because of

the issues still outstanding, the Motion to Stay was denied (Dkt. No. 112).  Thereafter, the main

active issue (other than the resolution of the State Court Case) became the retention and payment

of counsel.[11]

    As for the fee and related disclosure issues, less than three hours before the scheduled

May 8th hearing (and long after Counsel's self-selected, April 10th deadline) Mr. Burns filed

applications to employ himself and Mr. McDowell, the state court litigator (Dkt. Nos. 105 &

106) (Applications to Employ).  The Applications to Employ for the first time provided the

retainer agreements which the Court had ordered Mr. Burns to produce by April 1st.  The

statement of services and the payment documentation required by the First Order to Justify Fee

were not submitted.  Due to that failure and the many changes in the posture of the case since the

First Order to Justify Fee was issued, the Court announced to Counsel that it would issue an

amended order to justify fee.  Counsel was informed that he would have five days to produce the

still missing documents and that a failure to adhere to the deadline would result in disgorgement

of some or all of his fees.

---

[10] It cannot be overemphasized that Counsel's decision to file these two cases as separate Chapter 13s, instead of as
a single Chapter 11, was an invitation to the fierce eligibility litigation that followed.  There is not a single, rational
reason that overrides the simple logic of avoiding the obvious eligibility issue by choosing the smoother path of that
a Chapter 11 would have provided.

[11] On August 28, 2013, Mr. Nicholson filed a complaint requesting that the debt arising from the Judgment be
excepted from the Debtors' discharge.  On September 29, 2013, the Debtors objected to Mr. Nicholson's claim,
relying upon the grant of a new trial on the issue of damages.  On November 8, 2013, with the consent of the parties,
the Court referred the disputes to mediation but that did not lead to settlement.  Eventually, the complaint and
objection were mooted by the parties' settlement of the State court case and the dismissal of this bankruptcy.

G.      *Second Order to Justify Fee and Fee Applications*

On May 13, 2013, the Court entered an Amended Order to Justify Fee (Dkt. No. 119). The Amended Order to Justify Fee highlighted the Court's dual concerns in this case starting with Counsel's position that the $29,000 retainer was in line with the App. F ¶ 4(B) flat fee provisions. The second concern was that after five months and extensive, expensive litigation, these cases were finally in the posture they likely should have been in at their inception: joint Chapter 11 cases with the automatic stay lifted so the State Court Case could proceed to final resolution. As promised, the Amended Order to Justify Fee allowed five days for compliance.

On May 15, 2013, Mr. Burns filed a Motion to Extend Time for Response and supporting Documents Related to Amended Order to Justify Fee and Related Requirements (Dkt. No. 121) which requested until May 27, 2013 to file a response to the Amended Order to Justify Fee. On May 22, 2013, Mr. Burns filed an Amended Motion to Extend Time for Response and Supporting Documents Relating to Amended Order to Justify Fee and Related Requirements (Dkt. No. 124) this time requesting until May 29, 2013 to file the requested documents. The motions to extend time requested additional time allegedly due to health issues encountered by Counsel's support staff at his solo practice. Had this been the first time the production of the documents was ordered, the request may have been granted. But this was not the first time and, frankly, the Oversigned concluded that, given the context, Counsel's excuses hovered somewhere between inexcusable neglect and outright contempt for the Court's process. Therefore, on May 24, 2013, two full months after the First Order to Justify Fee was entered, the Court entered an Order Sustaining in Part Amended Order to Justify Fee and Ordering Partial Disgorgement of Retainer (Disgorgement Order) (Dkt. No. 125). As a sanction for Counsel's failure to respond either in time or in full to the Orders to produce documentation, the

11

Disgorgement Order required Counsel to return $20,000 of his retainer within five (5) days.  On May 29, 2013, Mr. Burns certified the disgorgement and provided a copy of a check evidencing the same.

On June 7, 2013, Mr. Burns filed the Motion for Reconsideration which provides much of the fodder for this Opinion (Dkt. No. 128).  In it, he argued that 1) the Court could not limit his compensation to the $4,500 flat fee described in App. F and 2) that he had not been afforded due process prior to the issuance of the Disgorgement Order.  He also contended that Counsel had failed to comply with the First Order to Justify Fee because he believed all fee issues would be resolved upon conversion to Chapter 11 as applications to employ and for compensation would be required. The Motion for Reconsideration was, at last, accompanied by the payment documentation, time sheets and copies of retainer agreements (Dkt. Nos. 129 & 130).

H.    *Supplemental Application for Employment*

To further complicate the attorney employment tangle, on June 11, 2013, Mr. McDowell, though his newly-retained counsel Roger Schlossberg, Esquire filed a Verified Supplemental Application of Peter McDowell, Esquire, for Employment as Special Counsel to the Debtors in Possession (Dkt. No. 131) (McDowell Supplemental Application).  In it, Mr. McDowell acknowledged that he had accepted a retainer of $15,339.00 from the Debtors at the time he was retained.  However, this contradicted the information included in the Disclosures of Compensation of Attorney for Debtor signed by Mr. McDowell which acknowledged payment of only $10,226.00 ($5,113.00 in each case) (Case No. 12-32831, Dkt. No. 23; Case No. 12-32832, Dkt. No. 25).  By way of explanation, the McDowell Supplemental Application stated that Mr. McDowell had not carefully reviewed the original disclosures that Mr. Burns prepared. Moreover, the original disclosures indicated that Mr. McDowell would provide the Debtors an

12

extended mélange of bankruptcy related services.  Now, in the McDowell Supplemental

Application, Mr. McDowell clarified that he had only been retained to represent the Debtors in

the State Court Case and had only ever performed work in that case.  The McDowell

Supplemental Application also revealed that Mr. McDowell had been unaware of the need to file

an application for compensation in a bankruptcy case before receiving payment; Mr. McDowell

had been sending monthly billing statements to the Debtors and had drawn down on his retainer

without orders of approval.  Mr. McDowell indicated that he first became aware of the need to

file applications for approval of compensation in a conversation with Mr. Burns that occurred

around May 15, 2013.  Mr. McDowell averred that Mr. Burns, the bankruptcy expert, was

mainly responsible for the sloppiness and resulting misunderstandings.

     In response, on June 12, 2013 the Debtors filed a five page "withdrawal" (Dkt. No. 135)

of the application to employ Mr. McDowell filed by Mr. Burns.  That paper was largely aimed at

defending Mr. Burns from the blame assigned to him by Mr. McDowell.

     *I.     July 22, 2013 Hearing*

     On July 22, 2013 a hearing was held on the Amended Order to Justify Fee, the

Applications to Employ Counsel,[12] and the Motion for Reconsideration.  Two hours prior to the

hearing, Counsel filed a First Interim Application for Compensation for Counsel for the Debtor

and Debtor in Possession and for Reimbursement of Expenses (Dkt. No. 149) (First Fee

Application).  The First Fee Application included a 76% write down of the fees that Counsel

could have attempted to claim based on his hourly fee rate alone.

     As the hearing began, the Oversigned sought to narrow things down.  First, Mr.

McDowell was informed that it was unlikely he would be penalized for paying himself

prematurely in light of the mess.  Second, the Court made it clear to Mr. Burns that the

---

[12] The McDowell Supplemental Application replaced the original application to employ Mr. McDowell.

Disgorgement Order was intended as a sanction for his gross failure to comply with the Orders to Justify Fee. Yet, he was also told that the Disgorgement Order would likely not permanently impair his ability to apply for compensation. Finally, the Court stated that it required a better understanding of the State Court Case, its nature and its progress, and a detailed explanation of why a case in the post-trial motions phase required the services of two attorneys. Both attorneys were required to file amended applications for employment and compensation to, in part, explain the dual representation.

To begin the explanation, Mr. McDowell took the stand. He testified that the State Court Case had initially resulted in a verdict of $700,000 and two post-judgment motions had been filed on the Debtors' behalf. Mr. McDowell had been hired by the Debtors to replace their existing counsel while those motions were pending. Mr. McDowell agreed to the representation and had to quickly order transcripts, request leave to supplement the pending motions and prepare for the post-trial hearing. However, at the hearing the question of whether Mr. McDowell could represent the Debtors was raised as his employment had not been approved by this Court. The hearing was continued, in part to have that issue resolved. Mr. McDowell also confirmed that Mr. Burns had assisted him in his representation of the Debtors in the State Court Case, focusing upon any bankruptcy-related issues.

The Court decided to approve Mr. McDowell's employment *nunc pro tunc* in part to assure that Mr. McDowell was properly authorized to represent the Debtors from the inception of his hiring. However, the issue of his compensation was reserved and the hearing continued until October 7, 2013 in anticipation of the filing of amended applications for employment and compensation.

14

J.        *October 7, 2013 Hearing*

On October 7, 2013, the hearing on Mr. Burns' applications for compensation,[13] the

updated applications to employ Mr. Burns and Mr. McDowell (Dkt. Nos. 163 & 166), the final

application for compensation filed on behalf of Mr. McDowell (Final McDowell Application)

(Dkt. No. 162) was reconvened.[14]  The Fee Application requested fees of $82,903.20 for all

services in both cases from December 27, 2012 to August 31, 2013 in addition to $4,142.84 in

expenses.  However, this reflected a write down of almost 48% of the fees that Mr. Burns stated

he had earned.  The Fee Application also reiterated the arguments made in the Motion for

Reconsideration: 1) that the filing of two Chapter 13 cases for the Kestners was appropriate; 2)

that the Disgorgement Order was issued without due process; and 3) that the App. F flat fee

arrangement is an inappropriate limitation on compensation.

At the hearing, the Court first indicated that the Final McDowell Application would be

approved.  However, the Court noted that there were some minor inconsistencies between the

application itself and the supporting documentation.  As a result, the Court instructed Mr.

McDowell and Mr. Schlossberg (who arrived late) to submit a statement clarifying the

discrepancies as well as an updated disclosure of compensation.[15]

Most of the hearing was consumed by argument on the Fee Application and the Motion

for Reconsideration.  The Court questioned Mr. Burns at length on his expectations for the case

and the reason behind his decision to file two Chapter 13 cases instead of a single Chapter 11.

---

[13] The First Fee Application was amended on September 14, 2013 by the filing of a First Amended Interim
Application for Compensation for Counsel for the Debtor and Debtor in Possession and for Reimbursement of
Expenses (12/27/12-08/31/13) (Dkt. No. 167). However, the Amended Application for Compensation was again
amended and filed as the Fee Application at Dkt. No. 169.

[14] Between the July and October hearings, Mr. McDowell was able to convince the state court to vacate the money
judgment, although the finding as to the Kestners' liability remained intact.  Despite Mr. McDowell's success, the
Kestners decided to retain yet another attorney, Kevin Schaeffer, Esquire (Dkt. No. 188).

[15] Mr. McDowell did not provide the supplementation until months later (Dkt. No. 269).

The Court also questioned Mr. Burns on his failure to promptly obey the two orders to justify

fee. When the debate was over, Mr. Burns was told that, in light of his substantial effort on the

Debtors' behalf, an interim fee would be approved but a memorandum opinion addressing his

due process concerns would have to be issued before the entirety of the requested fee was

considered.[16] This is that opinion.

## III.    <u>Jurisdiction and Venue</u>

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 1334,

157(b)(2)(B) and Local Rule 402 of the United States District Court for the District of Maryland.

Venue is likewise proper under 28 U.S.C. §1409(a). The Court concludes that this is a Core

proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and that the entry of this Opinion and the

accompanying Order do not offend the principles enunciated in *Stern v. Marshall*, 131 S. Ct.

2594 (2011).

## IV.    <u>Legal Analysis</u>

   A.    *The Motion for Reconsideration*

The Motion for Reconsideration was brought under Bankruptcy Rule 9023 which makes

Federal Rule of Civil Procedure 59 applicable to all bankruptcy cases. Under Rule 59, the court

may reconsider its decision to correct errors of law. *In re El-Amin*, 252 B.R. 652, 654 (Bankr.

E.D. Va. 2000). Counsel asserts the following errors of law:

   1)    It was inappropriate for the Court to enter the Orders to Justify Fee where
         Counsel was not employed by the estate, as opposed to the Debtors.

   2)    Debtors' Counsel did not receive due process before the Court ordered
         disgorgement of a portion of the retainer.

         i.    *The Court's Power to Review Compensation and the
               Appropriateness of the Orders to Justify Fee*

---

[16] An interim order approving fees in the amount of $40,000 was entered on October 15, 2014 (Dkt. No. 190).

*a.      The Power of the Courts to Review Attorney Compensation*

Section 105 of the Code empowers bankruptcy courts to issue any order appropriate to

carrying out the provisions of the Code.  The Orders to Justify Fee were entered to allow an

examination of the reasonableness of the compensation and retainers Debtors' attorney had

received prior to the commencement of this case.  As such, the question of whether the Court had

the authority to enter them is easily answered. It did.  Section 329 contemplates just this

situation:

> (a)      Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.
>
> (b)      If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—
> (1) the estate, if the property transferred—
>        (A) would have been property of the estate; or
>        (B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or
> (2) the entity that made such payment.

11 U.S.C. § 329 (2006). The statute is clear and if its express conditions are satisfied, the

compensation or contemplated compensation of *any* attorney representing a debtor in connection

with a bankruptcy case is subject to court review and possible disgorgement.  Receipt of money

from a third party is no shield.  In such a situation, excessive compensation is merely returned to

the third party instead of the estate.

Section 329's grant of authority is supported by Bankruptcy Rule 2017(a), which

provides in part:

> On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any

> payment of money or any transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code by or against the debtor or before entry of the order for relief in an involuntary case, to an attorney for services rendered or to be rendered is excessive.

FED. R. BANKR. P. 2017(a). The rule specifically authorizes a *sua sponte* investigation.

The Fourth Circuit has likewise held that even when compensation derives from non-estate property, the Court has the power to review compensation of attorneys representing debtors. In *Burd v. Walters*, 868 F.2d 665 (4th Cir. 1989) the question of whether a bankruptcy court had the power to review compensation, and order its partial disgorgement, as to attorneys who were paid by the debtors with exempt insurance proceeds was decided. The Court held that "[t]he regulatory effect of neither § 329 nor B.R. 2017 is conditioned on the source of payment; rather, it depends upon the nature of the services rendered. The provisions are meant to protect the creditors and the debtor against overreaching by attorneys." *Id.* at 668 (internal citations omitted). The review of the fees was upheld and the disgorgement order affirmed. *Id.* at 670-71.

The history of bankruptcy courts reviewing attorneys' fees, especially those of debtor's counsel, is a long one. *See Woods v. City Nat. Bank & Trust Co.*, 312 U.S. 262 (1941); *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833 (3d Cir. 1994); *In re Valentine*, 139 F. Supp. 576 (D. Md. 1956); *In re Kross*, 96 F. 816 (S.D.N.Y. 1899) (tackling the standard for determining allowable fees for debtor's counsel under the then new 1898 Bankruptcy Act); *In re Gay*, 390 B.R. 562 (Bankr. D. Md. 2008); William J. Rudin, *Symposium, Creditors' Rights, Fees and Allowances to Attorneys in Bankruptcy and Chapter XI Proceedings*, 34 FORDHAM L. REV. 387 (1966), *available at* http://ir.lawnet.fordham.edu/flr/vol34/iss3/2.[17]

Guidelines regarding attorney compensation have been written into bankruptcy law since at least the Bankruptcy Act of 1898. *See Kross*, 96 F. at 818-19 (analyzing the two provisions of

---

[17] The hyper-link was last visited on April 20, 2015.

the Bankruptcy Act of 1898 which allow for debtor's counsel to be compensated from the estate).  Under the 1898 Act it was also clear that the court overseeing a bankruptcy case would have independent discretion to review fees whether or not other parties in the case had objected. *In re Goodman*, 17 F. Supp. 337, 338 (W.D.N.Y. 1936) ("The fact that no objection is made to a requested allowance to an attorney for a trustee in bankruptcy is immaterial to the determination of the amount to be allowed by the court.  Allowance of attorneys' fees in bankruptcy proceedings is largely in the discretion of the District Court.") (internal citations omitted).

Despite the limits placed on the compensation attorneys could receive from the estate, the 1898 Act was insufficient to curb abuse in this area and the Bankruptcy Act was revised in 1934 and 1938, in part, to try and remedy the problem.  *Wolf v. Weinstein*, 372 U.S. 633, 639 (1963) ("The virtual immunity which active participants in corporate reorganizations enjoyed from judicial superintendence of abuses in the payment of compensation and allowances was one of the principal reasons for the enactment of § 77B of the Bankruptcy Act in 1934.").  One of the key goals of the extensive 1938 amendment – called the Chandler Act – was to disassemble the system whereby a cabal of corporate management and major parties in interest, supported by counsel, dictated the terms of reorganization without independent review.  *See* Alfred B. Teton, *Reorganization Revised*, 48 Yale L.J. 573, 573-74 (1939).  This system resulted in "[t]he building up of large fees for counsel, trustees, and committees, and the obtaining of other special benefits not justified by any principal of equity."  Walter Chandler, *The Revised Bankruptcy Act of 1938*, 24 A.B.A. J. 880, 883 (1938) (summarizing the key provisions of the Chandler Act).  To prevent these inequitable fees, "[u]nder Ch. X of the Chandler Act the bankruptcy court ha[d] plenary power to review all fees and expenses in connection with the reorganization *from*

*whatever source they may be payable.*" *Woods v. City Nat. Bank & Trust Co.*, 312 U.S. 262, 267 (1941) (emphasis added).

However, despite this, concerns regarding the size of fees charged by bankruptcy attorneys continued. Even without the corruption of the pre-Chandler Act era, the limited assets of the bankruptcy estate dictated a spirit of economy when it came to compensation. *In re Valentine*, 139 F. Supp. 576, 577 (D. Md. 1956); *Rudin, supra*, at 387. Therefore, in 1978, when bankruptcy law underwent one of the most profound and elegant code restructurings ever, Congress implemented "a system of checks and balances on the employment and compensation of professionals" to prevent a system which "operate[d] more for the benefit of attorneys than for the benefit of creditors." *In re EWC, Inc.*, 138 B.R. 276, 279 (Bankr. W.D. Okl. 1992) (citing H. Rep. No. 95-595, *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6053).

Section 329 was enacted as a part of this strategy of prevention. The Senate and House recognized that "[p]ayments to a debtor's attorney provide serious potential for evasion of creditor protection provisions of the bankruptcy laws, and serious potential for overreaching by the debtor's attorney, and should be subject to careful scrutiny." S. Rep. No. 95-989, *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5825; H. Rep. No. 95-595, *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6285. Therefore, even when it is derived from a source other than the estate, Congress intended that the Court keep a tight rein on compensation to debtor's counsel.

This mandated vigilance is especially important in consumer bankruptcies where often unsophisticated debtors rely upon their attorneys to guide them through the process. This dependency may make debtors vulnerable and reluctant to express their concerns regarding counsel. *See In re Lewis*, 309 B.R. 597, 604 (Bankr. N.D. Okla. 2004) (containing a powerful

example of just such reluctance); 3 COLLIER ON BANKRUPTCY ¶ 329.01 at p. 329-3 (Alan N.

Resnick & Henry Sommer eds., 16th ed. 2009).

The combination of historical abuses, Congressional mandate and debtor vulnerability

has created in the court not just a power to review the compensation of debtor's counsel, but a

duty.  As stated by the most respected bankruptcy treatise:

> Section 329 of the Bankruptcy Code not only recognizes the
> bankruptcy court's traditional concern for the need to carefully
> scrutinize the compensation paid to the debtor's attorney, but it
> recognizes that the court has a duty to do so, *sua sponte* and even
> in the absence of objections.  Courts have long acknowledged that
> debtors are in a vulnerable position and therefore might be
> reluctant to object to fees . . . .  In order to prevent overreaching by
> an attorney, and provide protection for creditors, section 329
> requires that an attorney submit a statement of compensation [to be
> paid] to enable the court to determine if fees are reasonable.  Thus,
> section 329 establishes a process that is statutorily mandated to
> insure that only reasonable fees are charged for services provided
> to debtors.  A law firm's obligations under section 329 to timely
> disclose its fee arrangements, a significant complement to the
> firm's obligation to disclose conflicts of interest it may have
> pursuant to section 327, is central to the integrity of the bankruptcy
> process.
>
> Section 329(a) and the Federal Rule of Bankruptcy Procedure 2016
> require that debtor's attorney timely file with the court an accurate
> statement of not only the amount of compensation paid or agreed
> to be paid to the attorney for services rendered or to be rendered in
> contemplation or in connection with the case under the Bankruptcy
> Code, but also the source of funds, regardless of whether counsel
> will seek compensation from the estate.  The disclosure obligation
> is mandatory and not permissive, and it is a continuing one.
> Further the court and parties in interest should not be required to
> search out facts which the bankruptcy rules require for full and
> accurate fees disclosures.  Once a question has been raised about
> the reasonableness of an attorney's fee under section 329, the
> attorney bears the burden of establishing that the fee is reasonable.
>
> The disclosure requirement of section 329(a) facilitates the court's
> examination pursuant to section 329(b). Under section 329(b), if
> compensation exceeds the reasonable value of the services
> provided, the court may deny compensation to the debtor's

> attorney, cancel an agreement to pay the compensation, or order
> the return of compensation previously paid.

*Id.* at 329-3-4; *see also Tri-State Financial, LLC v. Lovald*, 525 F.3d 649, 655 (8th Cir. 2008)

("The bankruptcy court has the broad power and discretion to award or deny attorney fees, and,

indeed, a duty to examine them for reasonableness.") *citing In re Clark*, 223 F.3d 859, 863 (8th

Cir. 2000); *In re Courtois*, 222 B.R. 491, 495 (Bankr. D. Md. 1998).  In light of the essential

importance of the court's power to review fees, it was not only within the Court's power to issue

an order to justify fee, it would in fact have been a dereliction of duty for the Oversigned not to

do so where the compensation arrangements were so questionable on their face.[18]

> B.      The Appropriateness of the Orders to Justify Fee

None of this means that counsel may be arbitrarily ordered to justify his fees.  Here,

Counsel has challenged the Orders to Justify Fee and the subsequent disgorgement order as an

inappropriate attempt to limit compensation to the $4,500 flat fee allowed by the local

bankruptcy rules.  Appendix F to the Local Bankruptcy Rules of this Court, entitled Chapter 13

Debtor's Counsel Responsibilities and Fees (App. F), governs in part fees for the representation

of Chapter 13 debtors.  Paragraph 4 sets forth three fee arrangements which are presumed

reasonable.  Appendix F was first developed when a group consisting of members of the

consumer bankruptcy bar, representatives of the Chapter 13 Trustees and the U.S. Trustee's

Office began a discussion with the bench, geared to implementing presumptively reasonable flat

fees.  *See In re Bellamy*, 379 B.R. 86, 92 (Bankr. D. Md. 2007).  App. F was intended to serve

two purposes: 1) to clarify the scope of attorney representation of Chapter 13 debtors and 2) to

streamline the compensation process.  *See id.*  When counsel selects one of the fee arrangements,

---

[18] From this vantage point, it appeared as if Counsel had charged a Chapter 11 scale retainer, yet purposefully filed
the cases as separate Chapter 13s with the expectation that a fierce battle over qualification would ensue, thus
draining the retainer in short order.

the need to file an application and seek court approval of the fee is eliminated. *Id.* at 93.[19] Each arrangement is completely voluntary. *See id.* Paragraph 7 of App. F states "[n]othing in this Appendix F shall preclude, restrict, or prohibit counsel from entering into fee arrangements different from those arrangements described in Paragraph 4 above." However, if counsel chooses an alternate arrangement, such as an hourly rate "[c]ounsel must file an application for compensation in accordance with the Bankruptcy Code, Bankruptcy Rules, and the Rules of this Court." App. F ¶ 7.

Flat, "no look" fee arrangements recognize that the work performed by Chapter 13 debtor's counsel can be generally similar across cases. *See In re Elapio*, 468 F.3d 592, 599 (9th Cir. 2006); *Bellamy*, 379 B.R. at 94. Such arrangements have been widely upheld as an efficient and reasonable way to approach compensation in consumer cases. *See Elapio*, 468 F.3d at 599; *In re Day*, 213 B.R. 145, 151 (C.D. Ill. 1997); *Bellamy*, 379 B.R. at 94-96 (listing some of the districts where flat fees are used). However, they have limitations and are, for example, generally not appropriate in cases with a certain level of complexity.

Here, the disclosures of compensation, signed and filed by Debtors' Counsel, stated that compensation would be pursuant to App. F ¶ 4(B). Subsection B allows attorneys to charge $4,500 for representation in all matters in the main bankruptcy case, save for U.S. Trustee audits. If counsel selects the $4,500 arrangement, he waives all opportunity to apply for additional fees in the main case, except "for work done upon matters that were not reasonably expected and that are extraordinary." App. F ¶ 4(B). Because of this express limitation, the fact that the Disclosures of Compensation indicated that Counsel had "earned" $4,660.50 in addition to the $9,000 he had already charged for the two cases raised serious concerns. At that time there was

---

[19] This, of course, does not abrogate counsel's duty to disclose the fee arrangement nor the Court's ability to issue an order to justify fee to examine fees in a particular case.

no adversary proceeding, audit or appeal pending and it appeared from the record that Mr.

McDowell was handling the State Court Case. Therefore, there was nothing that explained 1)

how Counsel had earned $4,660.50 and 2) what justified an additional $20,000 in retainers when,

several months after the filing, there had been no litigation outside of the main cases.

The Lead Case Disclosure (Dkt. No. 9) stated that Counsel had agreed to accept $4,500

for representation and had received $4,500 pre-petition. It then continued as follows:

> Fee Agreement According to Appendix F4B - Docket #3
>
> $281.00 received by firm prior to filing.
>
> An Advance of $449.00 has been received for postage,
> amendments, copies, PACER services and faxes of an ordinary
> nature or other actual and allowable expenses per Appendix D.
> Cousel [*sic*] will update this disclosure at Confirmation or
> Dismissal, and any surplus is to be refunded to Debtor or reserved
> for post Confirmation representation and any unpaid balance to be
> satisfied by Debtor.
>
> A litigation retainer of $10,000.00 was received from Barbara
> Kestner with $2725.50 having been earned.

The disclosure in Mr. Kestner's case was identical except that it claimed a lower fee already

earned from the litigation retainer (Case No. 12-32832, Dkt. No. 9). No further explanation was

provided regarding the grand total of $30,460 for fees and expenses that Counsel had received

pre-petition from the Debtors.

Even by the time of the October 2013 hearing, Debtor's Counsel could not adequately

explain the reason for apparently anticipating both a "routine" Chapter 13 case (or cases) where a

flat fee would be appropriate *and* litigation outside of the main case sufficient to warrant a

$20,000 retainer.

> THE COURT: So, if you thought that this case, the 13s, were
> going to be quick, easy, fast, and get to confirmation, why did you
> charge the extra $10,000 in each case?

24

MR. BURNS: Because as with certainly any case I handle, if I'm a lawyer, I'm going to look at the worst case scenario, I'm going to charge a retainer; not a fee. It's not a flat fee, it's not earned, but it's a retainer to the extent litigation unfolds, the ensures –

THE COURT: Litigation that wasn't anticipated and wasn't expected, right?

MR. BURNS: Litigation that was extraordinary and not reasonably anticipated or adversary proceeding.

THE COURT: So, this is litigation -- you're charging them for litigation that you didn't think was going to happen.

MR. BURNS: I'm charging them for litigation that I did not know one way or the other was going to happen, Your Honor. But I had to –

THE COURT: You're charging them for litigation that you didn't know, one way or the other, was going to happen.

Transcript of Hearing at 12-13 (Oct. 7, 2013) (Dkt. No. 212).

This unexplained dissonance between Counsel's avowed expectation of a routine case, indicated by the choice of a flat fee provision, and his decision to collect more than six times the amount a married couple will typically pay for a Chapter 13 case raised alarms. This was especially true as the claim of a "no look" fee under App. F indicates that Counsel did not intend to file a fee application.[20]  Considering the congressionally imposed duty to review the fees of debtor's counsel, it would have been wildly inappropriate *not* to have issued an order to justify fee.

As the Court explained at the October 7, 2013 hearing:

---

[20] Prior to filing Chapter 13, Counsel returned to the Debtors a retainer received from them and had it replaced with funds received from Barbara Kestner (who may be Ms. Kestner's mother). Fee Application 4-5. Counsel acknowledged that this was done  so that  non-estate assets would stand for his retainer. *See, e.g.*, *Courtois*, 222 B.R. at 494 (noting that Debtor's Counsel does not require prior approval when paying himself from non-estate assets, but upholding the Court's duty to review such fees and order disgorgement if necessary).

25

> When I look at your disclosure of compensation at the beginning
> of the case, and I don't know anything about this case, I know
> nothing about this case, and I look at your disclosure of
> compensation and I see it refers to Appendix F. And I understand
> that this is not an Appendix F fee arrangement. It's $14,500, with
> the single word "litigation."
>
> And then I look at the companion case, and I see that you've done
> the same thing in that case for a total of $29,000. Do you see why I
> was concerned? Do you see why I want to know the answers to
> those questions? Especially when I look at Mr. McDowell's
> disclosure of compensation and see that he's charging them a
> retainer for that litigation, for the Anne Arundel County litigation.
> And I look at the case and I don't see -- there's no other litigation
> pending that I know of, and your disclosure doesn't make it clear.
> So, that's why I issued the original order to justify fee that said I
> want an explanation, and I want the underlying information --
> because it also looks like you've already paid yourself -- for me to
> be able to figure out under 329 and discharge my duty and my
> obligation as to whether or not the fee is reasonable and/or
> excessive.

Transcript of Hearing at 20-21 (Oct. 7, 2013) (Dkt. No. 212).

In the end, this case proved itself to be anything but a routine Chapter 13, something Counsel apparently foresaw when he accepted a sum of over $30,000 prior to filing. Counsel has now requested approval of fees in excess of eighty thousand dollars and the Court has already approved forty thousand dollars on an interim basis. It is patently absurd then to claim that the Court has somehow attempted to nefariously limit fees to the App. F flat rates. Rather, the Court was attempting to determine whether these cases were in fact routine where a flat fee was appropriate, or whether they were complex cases requiring a retainer of $29,000 to be followed by an application seeking approval of fees.

Counsel relies heavily upon the case of *In re Ingersoll*, 238 B.R. 202 (D. Colo. 1999) to support his contention that the Orders to Justify Fee and the Disgorgement Order reflect judicial overreach. *Ingersoll* primarily concerned due process and that aspect will be addressed *infra*.

However, the district court did express dissatisfaction with several aspects of the bankruptcy court's review of fees, including what it saw as the unwarranted "paternalistic" and adversarial stance between bankruptcy judges and attorneys seeking fees. *Id.* at 204, 208. However, this is a shallow, uninformed view; the strict – and protective – review of fees paid to debtor's counsel by bankruptcy courts is mandated by the long, sad history of client abuse and, more importantly, the consistent Congressional call to action. S. Rep. No. 95-989, *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5825; H. Rep. No. 95-595, *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6285. Over a century of precedent has established the duty to review and, if necessary, disallow the fees requested by counsel in order to protect the debtor and the estate. *Woods v. City Nat. Bank & Trust Co.*, 312 U.S. 262, 267-68 (1941); *In re 5900 Assocs., Inc.*, 468 F.3d 326, 329 (6th Cir. 2006); *In re Clark*, 223 F.3d 859, 863 (8th Cir. 2000); *In re A.H. Robins Co., Inc.*, 86 F.3d 364, 370 (4th Cir. 1996), *cert. denied*, 519 U.S. 993 (1996); *Burd v. Walters*, 868 F.2d 665, 668 (4th Cir. 1989); *In re Henricksen*, 291 B.R. 833, 837 (8th Cir. B.A.P. 2003); *In re Albrecht*, 245 B.R. 666, 672 (10th Cir. B.A.P. 2000); *In re Day*, 213 B.R. 145, 151 (C.D. Ill. 1997); *In re Bolton-Emerson, Inc.*, 200 B.R. 725, 730 (D. Mass. 1996); *In re Goodman*, 17 F. Supp. 337, 338 (W.D.N.Y. 1936); *In re Kross*, 96 F. 816, 817 (S.D.N.Y. 1899); *In re Courtois*, 222 B.R. 491, 495 (Bankr. D. Md. 1998).

The *Ingersoll* Court also objected to what it saw as a cookie cutter approach to fee awards based upon an assumption that "there is a single model of efficiency in a bankruptcy lawyer's office." *In re Ingersoll*, 238 B.R. 202, 207 (D. Colo. 1999). It is true that the no look fee awards – which were developed in concert with the consumer bankruptcy bar – are in part based upon a routinized approach to Chapter 13 debtor representation. However, in establishing these fees the parties involved recognized that not all Chapter 13 cases would present the same issues. That is why the flat fee provisions are voluntary. As explained by the Oversigned:

27

> Appendix F makes it clear that you're not bound by it. If you don't like those numbers, if you think that that's somehow disrespectful and makes it appear that bankruptcy attorneys are in the bargain basement of the Federal Court and you don't think you should live with that, then it says you don't have to. You can pick your own individualized or you can agree to your own individualized fee arrangement with your clients and then you have to file an application, and you have to go through that process to get it approved.

Transcript of Hearing at 21:16-25 (Oct. 7, 2013) (Dkt. No. 212). Here, Debtor's Counsel attempted to receive both the benefit of individualized compensation and the ability to be compensated without filing an application. It was this that caused the Court to step in.

### C.    *Debtor's Counsel Received Due Process Prior to the Issuance of the Disgorgement Order*

As previously noted, the Disgorgement Order was issued as a sanction for repeated failure to comply with the Orders to Justify Fee. However, it was not intended to be, nor has it been, an ironclad limitation upon the fee which Mr. Burns may receive in this case.[21] Under the provisions of Section 105(a),[22] the bankruptcy court has great power to sanction the attorneys who appear before it. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("[T]he power to punish for contempts is inherent in all courts."); *Burd v. Walters*, 868 F.2d 665, 669 (4th Cir. 1989); *In re Nguyen*, 447 B.R. 268, 281-82 (9th Cir. B.A.P. 2011) (holding that bankruptcy court's power to sanction attorneys under Section 105(a) extended even to suspending an attorney from practice). Civil contempt is appropriate where a party has failed to abide by a specific and unequivocal order of the Court. *In re General Motors Corp.*, 61 F.3d 256, 258 (4th

---

[21] To the extent that Mr. Burns' arguments focus on the due process necessary before fees are denied, they are misguided. Mr. Burns has not yet been denied any fees. This is the first order that addresses the extent to which Counsel's fees will be impacted by his actions in this case.

[22] Section 105(a) provides: "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."

Cir. 1995). The purpose of civil contempt is to enforce compliance. *Id.* A finding of willful disobedience is not necessary. *Id.* The question then becomes 1) whether the Disgorgement Order was necessary to enforce compliance with the Orders to Justify Fee and Section 329; 2) whether the Orders to Justify Fee were clear; and 3) whether Mr. Burns had notice that the Court might order the return of the retainer.

Here the Disgorgement Order was entered to ensure compliance with court orders after Counsel repeatedly failed to comply. The Orders to Justify Fee were issued in response to disclosures of compensation that were not only inconsistent and confusing but which also showed that Mr. Burns was paying himself outside of the fee guidelines and without intent to seek approval of his fee. As explained above, the Court has a duty under Section 329 to review counsel's fee arrangements with debtors and determine whether they are reasonable. Under Rule 2016(b), Counsel has a duty to assist the Court in this inquiry through complete disclosure. *In re Gay*, 390 B.R. 562, 570 (Bankr. D. Md. 2008); *In re Saturley*, 131 B.R. 509, 517 (Bankr. D. Me. 1991). "Counsel's fee revelations must be direct and comprehensive. Coy or incomplete disclosures which leave the court to ferret out the pertinent information from other sources are not sufficient." *Saturley*, 131 B.R. at 517 (Bankr. D. Me. 1991).

The Orders to Justify Fee therefore served as excavation tools, implemented to assist the Court in discharging its duties in the face of Counsel's half-hearted discharge of his. They could have been avoided entirely with a more comprehensive statement from Counsel. Again, an explanation from the record:

> An attachment, a paragraph or two, a paragraph -- two or three that says, "Judge, I'm going to be representing them in Anne Arundel County, they had another attorney, they fired him. They had another firm that stepped in" -- I believe you said Mr. Yumkas's firm -- "and they don't want them to represent them in the case. They need me to represent them. They need me to stand in the

> breach and hold it together while this moves forward because we
> believe that the judgment is wrong and should be reversed, and I'm
> going to do that for them. We're also hiring Mr. McDowell
> because he's a real expert in these matters, but we need him and
> we need me to bridge the transition. And that's what I'm going to
> be doing, and that's why I've charged extra money, and that's why
> this isn't an Appendix F situation."
>
>                     \*       \*       \*
>
> Now if you had explained all of that up-front, I think it's a fair
> guarantee that we wouldn't be standing here today having this
> hearing and all of this nonsense that's gone on in this case
> wouldn't have happened. But that's why I entered the order to
> justify fee.

Transcript of Hearing at 21, 22 (Oct. 7, 2013) (Dkt. No. 212).

      To permit a complete inquiry, the Orders to Justify Fee sought information regarding how

much Counsel had been paid, what work Counsel was performing and the terms of Counsel's

representation agreements. Specifically they sought a statement of services rendered and copies

of any and all documents related to the fee arrangement and the payment of the same. These are

documents and records that must be kept in the ordinary course of business. Both Orders to

Justify Fee were explicit in the documents the Court desired and the timeframe in which they

were to be produced. They were neither equivocal nor complicated.

      Due to the importance of the disclosure requirement[23] and the concerns outlined above,

the Court expected swift compliance. Instead, when the time to respond to the first Order to

Justify Fee had passed, nothing but a short, evasive memorandum (the Response) had been filed.

The Response stated that Counsel believed applications to employ would be appropriate and he

would file those, along with the timesheets and retainers agreements, by April 10th. Yet, it was

---

[23]As the Fee Application notes, "John D. Burns is the Managing Member of The Burns Law Firm, LLC and has
performed services in the bankruptcy arena since his Judicial Clerkship for the United States Bankruptcy Court for
the District of Maryland 1991" (Dkt. No. 167). Counsel with such esteemed lineage should be familiar with the
importance of complete disclosure of fee arrangements in a bankruptcy case.

not until May 8th, when a hearing on the First Order to Justify Fee was scheduled, that Counsel submitted the requested retainer agreements, attached to an application to employ (Dkt. No. 106). Timesheets and records of payments received from the Debtors were not included.

The Court made its displeasure known at the May 8th hearing and stated 1) that an amended order to justify fee would be issued (requiring compliance in five days) and 2) failure to comply would result in a contempt order being entered that would order disgorgement of a significant portion of the fees. By this point, Counsel had been notified of the need to comply with the orders by both the orders themselves and the specific verbal instruction of the Court which included the expected sanction for non-compliance.

The Amended Order to Justify Fee was issued five days after the May 8th hearing and gave Counsel five days (in addition to the five since the hearing occurred) to comply. Instead of promptly complying, Counsel filed two motions to extend time to comply. On May 24, 2013, two months after the Court had first ordered Counsel to produce documentation which should have been readily available, the Disgorgement Order was entered. As the Court explained:

> [W]hen I don't get a substantive response that supplies the underlying information, but I get something that looks to me like a non-response because it doesn't provide the detail and it also says, "Oh, by the way, because we're going to convert this case to Chapter 11, I'll respond to you later, Judge. When I file the applications to employ, I'll let you know then." Then that concerns me even more. And ultimately I concluded I'm not going to get a response from Mr. Burns unless I do something to really motivate him to respond, and I did. And that's when I got a response to explain all this.

Transcript of Hearing at 22 (Oct. 7, 2013) (Dkt. No. 212).

Once again Counsel turns to the *Ingersoll* case in challenging the Disgorgement Order. However, *Ingersoll*, as previously noted, discussed the procedure necessary before a reduction in

compensation is ordered.[24]  *In re Ingersoll*, 238 B.R. 202, 209 (D. Colo. 1999).  That jurisprudence is inapplicable here.  Even without the entry of an Order to Justify Fee, Counsel *was under a duty to provide full disclosure of his compensation arrangements.*  The Orders to Justify Fee underscored the following:  1) Counsel's disclosure had been insufficient to allow the Court to gauge the reasonableness of his fee, 2) Counsel's disclosure appeared inconsistent with App. F and the Code and 3) legitimate questions had arisen regarding the scope and necessity of Counsel's services.  Each document specified was to be produced by set deadlines.  Counsel repeatedly failed to abide by those deadlines such that the Court concluded he would never comply without strong, added incentive.  Therefore the Disgorgement Order was entered.

To the extent that Mr. Burns objects to the lack of a hearing, Counsel was given two opportunities for a hearing on the Orders to Justify Fee prior to the entry of the Disgorgement Order.  At the time of the May 8th Hearing, a meaningful hearing was impossible due to Mr. Burns' failure to provide the necessary records.  As for the second hearing date, Mr. Burns forfeited the opportunity for that hearing when he again failed to provide, in a timely fashion, the documents necessary for a proper evidentiary hearing to occur.  However, at this point, the Court has held two full evidentiary hearings on fee issues including the Orders to Justify Fee.[25]

---

[24] The greatest concern of the *Ingersoll* court was that the bankruptcy court provide detailed information regarding its objections to compensation and have a hearing on the same. *Ingersoll*, 238 B.R. at 204; see also *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 846 (3d Cir. 1994).  However, this Court was prevented from providing more detailed objections to Counsel's fee arrangement by the very same act which the Disgorgement Order sanctioned: the failure to provide information.  In this, the Disgorgement Order had more in common with a discovery sanction than a fee order.  *See Omega World Travel, Inc. v. Omega Travel and Shipping Agencies, Inc.*, 905 F.2d 1530, n.4 (4th Cir. 1990) (unpublished) (noting that civil contempt orders are generally not dispositive final orders as they are interwoven into the underlying action).

[25] By the time the final hearing was held on October 7, 2013, the Orders to Justify Fee had been subsumed into the Court's consideration of the Fee Application, which provided the details those orders sought (Dkt. No. 169).

### D.    Application for Compensation

Counsel's Fee Application states that he has earned fees of $157,714[26] but is requesting approval of only $82,903.20. Counsel has broken down his fees into the categories of Case Administration, Schedules & Statement of Financial Affairs, Claims, Business & Cash Flow, Applications for Fees & Employment, Meetings of Creditors, Plan & Disclosure Statement, State Court Case,[27] and Bankruptcy Litigation. Unfortunately, Counsel's reductions are not categorized in the same way that the fees themselves are so it is difficult to see how the fee reductions are apportioned and if the reductions comport with the facts of this case.

The task becomes more challenging as a result of the inconsistencies within the Fee Application and between the exhibits and application. For example, the fees enumerated in the categorical breakdown in the Fee Application (Breakdown) (Dkt. No. 169, at 25-29) total $154,055, while Counsel's invoices are for fees in the total amount of $156,898.50. On the final page of the Fee Application, however, Counsel claims that he has earned $157,714.00, a number supported by neither Fee Application nor exhibits. In addition, Counsel claims that he worked 272.80 hours on the Chapter 13 cases up until May 9, 2013 (*Id.* at 29). However the Breakdown shows 231.6 hours worked on the Chapter 13 cases in that period, plus an additional 31.3 hours worked in the State Court Case for a total of 264.9. The problems seem largely to stem from the invoices prepared prior to May 9th. The invoices for the Chapter 11 period match the Fee Application.[28] It is Counsel's duty to prepare error free applications for compensation. *In re*

---

[26] See below for a discussion of the accuracy of Counsel's figures.

[27] The Application identifies the State Court Case as the Anne Arundel County Litigation. The author will continue to refer to it as the State Court Case in this Opinion.

[28] It appears that each invoice in the Chapter 13 case is internally inconsistent. For example, in the invoice for Ms. Kestner dated April 11, 2013, the total fees are listed as $57,433.00. However, adding up the fees broken down by category on the final page of the invoice results in fees of only $54,628.50, a difference of $2,804.50. The Court can find no time entries which were not labeled or other obvious explanation for this discrepancy.

*Bernard Hill*, 133 B.R. 61, 62 (Bankr. D. Md. 1991).  Therefore to the extent percentage based reductions are applied, the Court will use the lower fees claimed in the Breakdown as a starting point.

      *E.*     *Legal Standard for Reviewing Fee Awards*

      Reviewing fee applications in bankruptcy cases involves applying at least three overlapping standards.  First, fees must be reasonable.  Section 329(b); Section 330(a)(1)(A).  In bankruptcy, reasonableness is determined by application of the "lodestar" analysis.  *See Harman v. Levin*, 772 F.2d 1150, 1152 (4th Cir. 1985).  The lodestar analysis is based upon the twelve factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974):

      (1)     the time and labor required;

      (2)     the novelty and difficulty of the questions;

      (3)     the skill requisite to perform the legal service properly;

      (4)     the preclusion from other employment;

      (5)     the customary fee;

      (6)     whether fee is fixed or contingent;

      (7)     time limitations imposed by the client or the circumstances;

      (8)     the amount involved and the results obtained;

      (9)     the experience, reputation, and ability of the attorney;

      (10)    the undesirability of the case;

      (11)    the nature and length of the professional relationship between client and attorney.

This test was later refined to provide guidance on how these factors were to be applied.

> [C]ourts [should] first ascertain the nature and extent of the services supplied by the attorney from a statement showing the number of hours worked and an explanation of how these hours were spent. The court should next determine the customary hourly rate of compensation. These are essentially Johnson factors 1 and 5. The court should then multiply the number of hours reasonably expended by the customary hourly rate to determine an initial amount for the fee award. Finally, the court should adjust the fee on the basis of the other factors, briefly explaining how they affected the award.

*Anderson v. Morris*, 658 F.2d 246, 249 (4th Cir. 1981).  In approaching the first step of this process, judges are not to simply accept the hours and rates as offered.  Rather a judge must evaluate which hours should be included in the award, the appropriate rate of compensation for each person working on the case and the "quality as well as the quantity of the attorneys' work." *Id*.

The Code adds additional considerations.  Fees for professionals, including attorneys, are determined under Section 330(a).  Section 330(a)(3) provides the general guidelines for determining reasonableness.[29]  This section has been interpreted to match the lodestar criteria outlined above.  *Harman*, 772 F.2d at 1152; *In re Bernard Hill*, 133 B.R. 61, 69 (Bankr. D. Md.

---

[29] Section 330(a)(3) provides:
> In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including-
> (A)  the time spent on such services;
> (B)  the rates charged for such services;
> (C)   whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
> (D)   whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;
> (E)   with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and
> (F)  whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

1991).  Section 330(a)(4)(A) contains a prohibition on fee awards for 1) unnecessary duplication

of services and 2) services which were not reasonably likely to benefit the estate or necessary to

the administration of the estate.  In the case of Chapter 13 debtor's counsel, however, the Court

may award fees for services which may not have benefitted the estate but instead were beneficial

and necessary for the individual debtors.  Due to this split standard, the Court will address the

Fee Application in three parts.  The first part will focus on the services provided through May 8,

2013, while these cases were administered under chapter 13. The second part will address the

services provided from May 9th through August 31, 2013 while these cases were administered in

Chapter 11.  The final part will address the State Court Case.

   *F.    Chapter 13 Fees*

   The key question to be answered in addressing the Chapter 13 portion of this case is: how

should the Court adjust compensation where additional, exorbitant fees were incurred by the

strategy of filing two Chapter 13 cases instead of a single Chapter 11 case.  There is no question

that Counsel's failed strategy resulted in significant duplication across the board - two petitions,

two sets of schedules, two plans, two statements of monthly income and attendance at two

separate meetings of creditors.  And then there is the needless litigation – the Motion to Dismiss

and the Motion to Consolidate – that was also a direct result of Counsel's guile.  The filing of a

single Chapter 11 case, while requiring some additional administrative costs, would have

eliminated much of the wastefulness.  In fact, between the Motions to Dismiss and the Motion to

Consolidate, Counsel expended approximately 71 hours[30] and accrued $28,044.50 in fees.  The

---

[30] As the Court consolidated hearings on several matters, some of the entries for hearing preparation and attending hearings might also be related to other matters.  However, the Motions to Dismiss and Consolidate were the bulk of the litigation during the Chapter 13 stage.  This amount also does not include entries for consultations with creditors regarding the status of their claim and amendments to schedules which were categorized as "Business Entity" work, but seem also to be prompted by the Motions to Dismiss.

likely cost of a Chapter 11 over the same time period that was not arguably vulnerable to a full frontal assault seeking dismissal would have paled by comparison.

Without any reduction, Counsel claims $81,592.50 in fees for 231.6 hours of work during the Chapter 13 case, which works out to a blended rate of $352.30.  Of that amount, $34,286.00 was for the category of services labeled Bankruptcy Litigation.  The remaining $47,306.50 was for services including Case Administration ($12,327), Schedules & Statement of Financial Affairs ($14,827.50), Claims ($2,279), Business & Cash Flow ($6,517.50), Applications for Fees & Employment ($1,204), Meetings of Creditors ($7,979.00) and Plan & Disclosure Statement ($2,172.50) (collectively, Bankruptcy Administration).  On page 38 of the Application, Mr. Burns claims that he has reduced his fees for "Bankruptcy Fees" from $46,039 to $9,000.  It is unclear which services Counsel has included in "Bankruptcy Fees" as there is no combination of the fees listed above that produces a total of $46,039.

In light of that the Court will perform its own analysis of this element.  First, due to the fact that the Kestners' own and operate several businesses, their affairs are more complicated that a typical consumer case.  For example, a typical consumer case would not require the preparation of Business & Cash Flow Statements.  In addition, married couples require a careful analysis of the ownership of each asset and debt.  While the filing of two cases instead of a single combined case increased administrative costs and created the kind of duplication of effort specifically forbidden by Section 330(a)(4)(A), this was never a case which could be administered on the cheap.  Nevertheless, the $40,789[31] claimed for the usual work of preparing schedules, attending meetings of creditors and the like is excessive, especially due to the large

---

[31] This does not include the charge for "Business & Cash Flow."  As explained this work is outside of the normal administrative work for a Chapter 13 case.

number of inconsistencies in the schedules which prompted extensive revisions. The Court will accept Counsel's invitation and reduce the award for these "Bankruptcy Fees" to $9,000.

That still leaves the $6,517.50 in fees for Business and Cash Flow. Much of the work here seems to be related to the M&T and BB&T Claims and the loans underlying the same. Gathering information on, understanding and perhaps negotiating these claims was necessary and beneficial to the debtors under Section 330(a)(4)(B). The rest seems to be consultations with accountants and Debtors regarding the state of their business and preparing income statements regarding the same. This work, too, was necessary and beneficial. Therefore, it is appropriate to allow compensation for these services. As for the *Johnson* factors, Counsel claims 16.5 hours of work in this category between the two cases for a rate of $395 per hour. All work on this matter was performed by Mr. Burns personally and not by paraprofessionals. Considering the nature and complexity of the work, however, this appears appropriate. Mr. Burns' rates are commensurate with the rate charged by other experienced professionals in this district and his own skill. Nevertheless, there are some charges in this section which give the Court pause. For example, one of the key issues in the Motions to Dismiss were issues regarding the BB&T and M&T Claims and whether they were in default. Several calls with these creditors, categorized as business related, touched on these issues.[32] As a result one hour of time, equal to $395, will be disallowed from this category; $6,122.50 will be allowed.

The next block of time to be addressed is that for Bankruptcy Litigation. Not including the reduction taken by Mr. Burns, this consists of 86.8 hours of work with fees of $34,286 for a rate of $395 per hour. The charges in this area can be broken down in four categories, as follows:

---

[32] See, for examples, entries on February 15th, 25th, 26th and 27th.

| Category | Hours Recorded | Fees Claimed |
|---|---|---|
| Motions to Dismiss | 64.6 | $22,516.50 |
| Motions for Relief From Stay | 12 | $4,739.50 |
| Motions to Stay | 5.7 | $2,656 |
| Motions to Consolidate | 6.4 | $2,528 |
| Total | 88.7[33] | $32,440 |

The first issue the Court must address is the Motions to Dismiss. As previously noted, motions to dismiss were filed by both the Chapter 13 Trustee and Mr. Nicholson, the Debtors' state court adversary. Both were premised on the assertion that Debtors did not qualify for Chapter 13 relief as their noncontingent, liquidated, unsecured debts exceeded the cap of $360,475 set by 11 U.S.C. § 109(e).[34] Between the BoA Claim and the general unsecured claims, Ms. Kestner admitted $223,407.32 in noncontingent, liquidated and unsecured debts. Therefore, in order to successfully defend against the Motions to Dismiss – by convincing this Court that her qualifying debt was below the prevailing limit − Ms. Kestner had to show that 1) the Judgment was not liquidated[35] *and* 2) that the BB&T Claims remained contingent.[36] A loss

---

[33] These hours exceed the totals listed in the paragraph above, but the fee totals are lower. The numbers in the chart come from the timesheets. As previously noted, the Fee Application is inconsistent with the timesheets. However, the timesheet is the only source from which the Court can ascertain the time spent on each aspect of litigation.

[34] The Nicholson MTD also included claims of bad faith. However, Mr. Nicholson waived these as soon as the Debtors moved to convert.

[35] The Kestners also tried to argue that the Judgment was secured by their principal residence, even though they simultaneously claimed that 1) it was not a joint judgment and 2) Debtors owned their principal residence tenants by the entirety. It is an elementary principal of law that only joint debts may attach to tenants by the entirety property. *Jordon v. Reynolds*, 105 Md. 288, 66 A. 37, 38 (Md. 1907). Therefore, if Debtors were correct and the Judgment was not joint, then the judgment lien did not attached to their principal residence.

[36] The M&T Claims were not of sufficient size to tip Ms. Kestner past the threshold on their own.

on either point would have been fatal.  For Mr. Kestner to succeed he would have had to show

that the Judgment was not liquidated.

Regarding the Judgment issue, Debtors argued that as timely post-trial motions had been

filed the Judgment was not final (MTD Response, at 5).  As far as Maryland state law regarding

the finality of judgments was concerned, it appears that Debtors were correct.  See *Nina &*

*Nareg, Inc. v. Movahed*, 369 Md. 187, 798 A.2d 557 (2002).  However, the true question is not

whether the judgment is final, but whether the debt is noncontingent and liquidated.  The Trustee

cited a wealth of case law to show that a non-final judgment had been deemed more than

sufficient to make a tort claim both non-contingent and liquidated.  *See In re Wiencko*, 275 B.R.

772, 779-80 (Bankr. W.D. Va. 2002); *In re Keenan*, 201 B.R. 263, 265-66 (Bankr. S.D. Cal.

1996); *see also In re Huelbig*, 313 B.R. 540, 543-44 (D. R.I. 2004); *but see In re All Media*

*Properties*, *Inc.*, 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980) (stating in dicta that a negligence claim

is contingent until final judgment is entered). Overall, the Court is convinced that the Judgment

was not contingent – as all actions necessary to incur liability had occurred - and was likely

liquidated.[37]  Therefore, like Sisyphus, the Debtors had a major uphill battle to show that the

Judgment should not count towards their unsecured, noncontingent and liquidated claim amount.

As for the Guarantee Claims, there is general agreement that when there is no default,

guarantee claims are contingent for Section 109(e) purposes.  As stated in *All Media Properties,*

*Inc*.:

> claims are contingent as to liability if the debt is one which the
> debtor will be called upon to pay only upon the occurrence or
> happening of an extrinsic event which will trigger the liability of
> the debtor to the alleged creditor and if such triggering event or
> occurrence was one reasonably contemplated by the debtor and
> creditor at the time the event giving rise to the claim occurred.

---

[37] The Judgment has since been reinstated in a lesser amount and the parties have settled.  This case has been
dismissed by agreement and has been held open only for the entry of this Opinion.

5 B.R. at 133.  The questions then are 1) what is the triggering event(s) for the Guarantee

Claims and 2) had it/they occurred.  Mr. Nicholson claimed that the triggering event was default

by the primary obligors, Middle River Sweeping, LLC and J & M Sweeping, LLC. *See*

Nicholson MTD (Dkt. No. 24, at 4) (citing *In re Pennypacker*, 115 B.R. 504, 507 (Bankr. E.D.

Pa. 1990); *In re Winters*, No. 12-10614, 2012 WL 1067696 (Bankr. E.D. Tenn. Mar. 12, 2012)).

Mr. Nicholson also alleged that based upon Ms. Kestner's testimony at the 341 meeting, the

defaults had occurred.  *Id.* at 3.

Ms. Kestner, however, did not appear to contest whether there had been an actual default.

Instead, she argued that a default alone was insufficient.  She claimed that the triggering event

for her liability had to be a notice or declaration of default and that such a declaration had not

been made.  MTD Response (Dkt. No. 45, at 8).  No case law was cited which supported the

alleged fine distinction between a *notice* of default, and a default.  Ms. Kestner attached two

letters to her MTD Response in an apparent attempt to bolster her argument.  However, the letter

from BB&T, dated February 26, 2012, stated that the loans were "paid current through October

31, 2012."  But that had little to do with the status of the loans as of the Petition Date of

December 27, 2012.  The letter from M&T stated, "[a]ll Commercial loans are currently in

repayment status per the Chapter 13, [*sic*] Bankruptcy plan," which sounds like an

acknowledgement of a default.  In order to decide the questions of what was a triggering event

under the underlying loan agreement and whether or not that event had occurred, a factual

inquiry would have been necessary.  Now, that will never happen.  However, from the scant

record it appears 1) the principal obligors had defaulted on their obligations and 2) when the

principal has defaulted, a notice of default is unnecessary to make a debt non-contingent.

Conversion mooted the underlying issues. However, the Motion to Convert admitted one of two possibilities: 1) that either the Kestners were not eligible for Chapter 13 or 2) if they were, the value of the litigation necessary to remain in Chapter 13 greatly exceeded the cost of Chapter 11 cases.

Mr. Burns has claimed that the Motions to Dismiss – along with the rest of the litigation in this case – was unexpected. This claim is preposterous. Counsel has repeatedly described the litigation tactics of Mr. Nicholson and his counsel as "aggressive." Transcript of Hearing at 11:23, 43:11 (Oct. 7, 2013) (Dkt. No. 212). Counsel even stated that "only an incompetent lawyer who would work for free in a *hostile multi-faceted litigation case* such as this would have entered into a retainer without a substantial retainer." Fee Application (Dkt. No. 169, at 6)(emphasis added). Mr. Burns must have anticipated that if the Kestners filed Chapter 13s, their debts were such as to leave them open to claims of ineligibility. As a result, the Motions to Dismiss were entirely foreseeable. If the neutral Chapter 13 Trustee sees an issue with eligibility, there is no question that "aggressive" counsel also will pounce upon the same opening.

There is then a question as to whether filing for Chapter 13 was "representing the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity" of filing Chapter 13. *See* Section 330(a)(4). Mr. Burns should have realized that litigating the motions to dismiss would be a lost cause, more costly than a Chapter 11 case. This was the exact point finally acknowledged by the Debtors' Motions to Convert. There was no benefit or reasonable expectation of a benefit to Debtors or the estate in continuing to litigate the Motions to Dismiss. *See, e.g.*, *In re Vu*, 366 B.R. 511, 522 (D. Md. 2007) (holding that fees should be awarded only where a reasonable attorney would have believed that the

services were reasonably likely to benefit the estate at the time they were rendered); *In re Saturley*, 131 B.R. 509, 521 (Bankr. D. Me. 1991) ("Fees generated in tilting at windmills will be disallowed."). The continuation of the Motions to Dismiss litigation seemed to be more of an attempt to make a litigation point (or perhaps churn fees) than to efficiently represent the Debtors' interest. *In re Cenargo Int'l, PLC*, 294 B.R. 571, 605 (Bankr. S.D.N.Y. 2003) (disallowing fees for work that appeared to be more focused on making a litigation point than benefiting the estate). As a result, the Court will disallow 75% of the fees requested in this category, for an allowance of $5,629.13 based on the lower numbers in the timesheet.

The next category of Bankruptcy Litigation is the Motions to Consolidate. These motions made clear on their face that they contemplated an administrative consolidation – more properly called joint administration – only. The purpose of the Motions to Consolidate was to allow for more efficient administration in cases that were closely intertwined and presented nearly identical issues. Bankruptcy Rule 1015 and Section 302 make clear that joint administration does not equal substantive consolidation, thus eliminating the spectre of debt aggregation. While Counsel is correct that Debtors filing jointly are sometimes required to aggregate their debts under a single Section 109(e) allowance,[38] this Court has never seen this limitation applied where spouses have originally filed separate petitions. Therefore, the Court believes that a simple review of the case law should have satisfied Debtors' concerns on this matter and no opposition was necessary. As a result, one half of the hours claimed for this category will be disallowed, for an allowance of $1,264 in this subcategory.

The next subsection of the Bankruptcy Litigation is the Motions for Relief from Stay. This is another area where the work seemed more aimed at proving a legal point (or wastefully

---

[38] There is a split of authority regarding this concept. *Compare In re Miller*, 493 B.R. 55 (Bankr. N.D. Ill. 2013) (spouses must aggregate debts) *with In re Werts*, 410 B.R. 677, 686-87 (Bankr. D. Kan. 2009) (spouses receive separate debt allowances).

accruing fees) than benefitting the Debtors or the estate. It was clear from the filings that both parties desired the State Court Case to go forward. However, they continued to go back and forth over the issue of whether or not the stay was in place. A reduction is therefore appropriate. Counsel will be allowed 80% of the fees he charged for this subsection for a total of $3,791.60. This reduction is relatively small as it appears that the debate over whether or not the stay was in place was initiated by Mr. Nicholson and not the Debtors. Nevertheless, it should have been resolved by consent.

The final subsection in the bankruptcy litigation category is the Motions to Stay. These motions sought to allow the Debtors to receive the benefits of bankruptcy – namely the stay of enforcement actions against them without the necessity of posting a bond – without any of the administrative burdens. While this would certainly benefit the Debtors, filed as they were in the midst of disputes over dismissal, fees, consolidation, and the accuracy of Debtors schedules, they were not appropriate. Therefore, Counsel's fees for this matter will be reduced 50% to $1,328. In total, Counsel will be allowed $12,012.73 for Bankruptcy Litigation and $27,135.23 for all bankruptcy related work while these cases were in Chapter 13.

The Court cannot leave this topic, however, without addressing Counsel's comments regarding the way he apportioned his fees. Counsel reduced all his compensation for work he deemed "bankruptcy administration" to $9,000 while claiming that all the Bankruptcy Litigation work was "unanticipated and extraordinary." He sought thereby to make his claim for fees appear to match the Appendix F flat fee provisions – the very same provisions he spent much of his Fee Application railing against. Counsel argues that the litigation in the Kestner cases was unanticipated and extraordinary by comparing the Kestners' cases to normal Chapter 13. However, this is not the proper test. The proper test for whether matters are "not reasonably

expected" and "extraordinary" is to compare what occurred in the case with the reasonable expectation of the attorney and client at the outset of representation. *In re Coleman*, No. 10-21265, 2014 WL 1452594, at *1-2, slip op. *3 (Bankr. D. Md. Apr. 14, 2014); *In re Coleman*, No. 10-21265, 2013 WL 3353847, at *3, slip op. *5-6 (Bankr. D. Md. July 3, 2013). In this case, Mr. Burns began his representation of Debtors prior to the decision to file a Chapter 13 case. Fee Application (Dkt. No. 169, at 5). Therefore, at the time they entered into the purported App. F ¶ 4(B) fee arrangement, Counsel and Debtors were well-aware that Mr. Nicholson was unlikely to quietly accept Debtors' bankruptcy especially given the questionable decision to file Chapter 13 cases, as opposed to a single Chapter 11. And in fact this is what occurred. In such cases, App. F, which is based on routine Chapter 13 representations, is not an appropriate fee model, as Counsel himself has noted. The solution to this was not attempting to fit a round peg into the square hole of App. F, but rather to choose an alternate fee structure that honestly reflected that nature of the case. In short, the litigation in this case was anything but unanticipated and extraordinary.

Outside of the work done in Chapter 13, Debtors' Counsel assisted in the State Court Case. His timesheet and Fee Application reflect 86.8 hours of work with $12.243.50 in fees earned through May 8, 2013. Counsel has elected to reduce his fee request for this portion of his work by 50% to account for possible duplication of effort between himself and Mr. McDowell. In truth the Court is uncertain that such a large reduction is necessary. Counsel's assistance in the State Court Litigation has been thoroughly supported by testimony and timesheets. However, Counsel has a better idea of the actual work he has performed with Mr. McDowell and therefore, the Court will accept his requested amount as appropriate. Counsel is awarded

$6,121.75 for this portion of his work.  This amounts to a total award of $33,256.98 for work on these cases through May 8, 2013.

G.      *Chapter 11 Fees*

In considering Chapter 11 fee awards, the Court applies much the same standard as Chapter 13 fees awards.  However, the service must benefit the estate to be approved.  Services which benefit the Debtors alone will not be allowed.  Overall, Counsel claims $60,219 in fees for 172.20 hours of work in the Chapter 11 cases, which works out to a blended rate of $349.70.  He has voluntarily reduced this amount by 20% across the board for a reduction of $12,043.80 to $48,175.20.  The $60,219 consists of $20,965.50 for work in the State Court Case and $39,253.50 for the Chapter 11 case.

Of the Chapter 11 portion, $12,412 was charged for work done on fee application and employment matters. The issue here is that, as the Court has previously noted, much of the dispute over fees could have been avoided with a more complete disclosure of the work Counsel was doing in the State Court Case combined with a more appropriate fee structure.  The resultant work for defending Debtors' Counsel's employment and fees, including the extraordinary forty page Fee Application, can be laid solely at Counsel's door and benefitted no one but Counsel. The Court has determined that 26.5 hours charged for fee applications and employment should be denied.  The Court reached this number by disallowing fees for all work that on the Motion for Reconsideration and other matters which might have been entirely avoided.  Half of the time spent in preparing applications for compensation and the July 22nd hearing has also been disallowed.  The remainder will be allowed in recognition of the fact that Counsel is generally entitled to compensation for preparing fee applications and applications to employ and he would have had to do significant work on these matters in this case regardless of how it was

approached.  The Court will therefore disallow $7,830.25 in fees from the original request.  As Counsel's overall reduction of 20% has sufficiently accounted for this amount no further deduction appears to be warranted.[39]  Therefore, fees for the Chapter 11 case will be allowed as requested.[40]

This award results in an overall reward of $81,432.18 in this case.  This is appropriate for a complex individual bankruptcy filing of this nature.  While the extent and complexity of the litigation in this case might normally prompt a higher fee award, here much of that litigation was unnecessary.  Counsel's fees for those amounts cannot be allowed.  None of the other *Johnson* factors seem to warrant an adjustment and Counsel has not pled otherwise.

    *H.*    *Costs*

The final issue to be addressed in the costs claimed by in the Fee Application.  These amount to $4,142.84 itemized on the exhibits submitted by Counsel.  Neither the Court nor interested parties have objected to these costs.  While the Court has no doubt that some of the copying and mailing fees could have been avoided with a more appropriate approach to the filing of these cases, sufficient account of that has been taken by the significant cuts to Counsel's fees.  Therefore the costs will be allowed in full.

**V.**    **<u>Conclusion</u>**

As will be memorialized in an accompanying order, the Motion for Reconsideration is denied.  Fees will be allowed in the amount of $81,432.18 and costs will be allowed in the total

---

[39] Counsel has given no reason for the unusually large across the board reduction of 20%.  Hopefully this reduction recognizes the extent to which Counsel was complicit in churning up the waters in this case.

[40] The issue of whether the work on the State Court Case benefitted the estate has not been raised by either the Court or any interested parties.  However, the Judgment is the largest single liability of the Debtors' estates.  Therefore there is little question that challenging the Judgment, in good faith and successfully, as Counsel has done, is of great benefit to the estate.

amount of $4,142.84.  The $81,432.18 award of fees includes the $40,000 which Counsel has already been allowed.  Therefore only $41,432.18 in additional fees will be allowed.

cc:     Debtors
        Debtors' Counsel – John Burns, Esquire
        U.S. Trustee
        All parties

**End of Opinion**